Filed 12/29/14  P. v. Gordon CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GLEN ROY GORDON,<br><br>    Defendant and Appellant. | H038780<br>(Santa Clara County<br> Super. Ct. Nos. 211500 & 211547) |

Defendant appeals from a judgment arising out of a carjacking and witness intimidation following that event.  We will affirm the judgment.

### PROCEDURAL BACKGROUND

Defendant was arrested on January 20, 2007.  Three years and one month later, on February 25, 2010, an indictment was filed in the Santa Clara County Superior Court charging him with carjacking (Pen. Code, § 215)[1] and personal use of a deadly weapon (§ 12022, subd. (b)(2)).  The indictment alleged four prior strikes (§ 667, subds, (b)-(i) & 1170.12), four prior serious felony convictions (§ 667, subd. (a)) and two prior prison terms (§ 667.5, subds. (a), (b)).  The grand jury returned a true bill.

---

[1] Unlabeled statutory references are to the Penal Code.

On May 13, 2010, a second indictment was filed in the Santa Clara County Superior Court charging defendant with two counts of witness intimidation. (§ 136.1, subd. (a)(2).) The indictment alleged four prior strikes (§ 667, subds. (b)-(i) & 1170.12) and four prior serious felony convictions (§ 667, subd. (a)). Again, the grand jury returned a true bill.

On July 9, 2010, the indictments were consolidated.

On March 8, 2012, a jury found defendant guilty of the substantive criminal charges and found true the allegation of personal use of a deadly weapon.

On March 9, 2012, following a bench trial on the recidivism allegations, the trial court found all of them true.

On September 7, 2012, the trial court sentenced defendant to a total term in state prison of 83 years to life consecutive to 64 years.

## FACTS

The events leading to defendant's prosecution unfolded more than five years before his trial. About 9:00 p.m. on January 19, 2007, he carjacked the automobile of Xing Yu, a Cantonese-speaking man with limited knowledge of English, off a street in San Francisco and made Yu drive around with him until he finally pushed him out of the car in San Mateo County. Sitting in the passenger seat, defendant threatened to club Yu with a slugging weapon, a sturdy 16-inch-long, three-quarters-inch thick metal rod he was holding, and he told Yu not to look at him further. He also threatened to kill Yu. Defendant did not steal any property in Yu's possession other than the car Yu was driving, but Yu's cell phone, which had been sitting on a seat inside the car, remained with the car as defendant drove it away.

Three hours later, defendant had driven Yu's car to an address in Mountain View, in Santa Clara County. Shortly after midnight on January 20, homeowners heard him prowling in their back yard. They called the police, who arrested him and obtained various items of evidence.

2

From Yu's account of events and the evidence gathered in Mountain View, the prosecution was able to introduce the following evidence:

1. Yu's car was parked in the street outside the house where defendant was prowling and defendant had the keys to the car.

2. There was a metal rod inside the car. Yu identified the object as being the one defendant threatened him with.

3. Yu's cell phone was found in the homeowners' back yard.

4. Deoxyribonucleic acid (DNA) analysis established that a bandana found in Yu's car had defendant's DNA on it. His DNA may also have been on the metal rod, although test results were inconclusive. Yu's DNA was not found on either item.

Against this, a Cantonese-speaking San Francisco Police Department Inspector, Phillip Wong, called in a few hours after the carjacking to see if Yu could identify defendant, testified that Yu could not identify him in a one-page photographic lineup of six individuals, a lineup that included him. Yu told Inspector Wong that he avoided looking at defendant, since he had ordered him not to look at him.

Also, according to other testimony, Yu made inconsistent statements about his attacker's race. He said at one point that his assailant was Samoan and at another point that he was African-American. In court Yu testified that his assailant was "not Black." Defendant is African-American. Yu was not asked to try to identify defendant in court.

The prosecution also introduced evidence that defendant intimidated prospective witnesses following his arrest. Because his appeal does not raise any claims of error on the witness intimidation charges or the recidivism allegations contained in both indictments, we will not describe the evidence relating to those items.

DISCUSSION

## I.   *Refusing to Allow an Extended Inquiry Into Whether the Victim Was or Was Not Able to Identify Defendant at Various Times*

Defendant claims that a trial court ruling limiting the scope of the questioning of Yu about statements concerning whether defendant was his assailant violated his right to confront the witnesses against him under the Sixth and Fourteenth Amendments to the United States Constitution and his right under the Fifth and Fourteenth Amendments to present a complete defense.

Inspector Wong testified that Yu could not identify defendant in the six-photograph lineup.  But Yu was barred from testifying about his reaction to the lineup or about another comment (according to a motion defendant filed) in which Yu, shown a suggestive photograph of defendant, said he was 70 percent sure defendant was his assailant.  In 2009, according to defendant's motion, Yu was shown another photographic lineup that included defendant and opined it was possible, though far from certain, that defendant was his assailant.

The prosecution's position was that there were language ambiguities—Yu's statements about the original photographic lineup were made in Cantonese—and Yu's identification efforts had been tainted by improper later viewings of defendant or his likeness.

Specifically, the prosecution moved to exclude any testimony by Yu on his reactions to photographs because, as it stated in the first sentence of its written motion, "Mr. Yu is unable to identify the person who carjacked him" and the prosecution would concede the point to the jury.  At the time of the motion, the prosecution said Yu could testify "at trial to confirm that he is *unable to identify* the perpetrator of the crime.  The jury will [thus] know that Mr. Yu cannot identify the perpetrator."

The prosecution was seeking to avoid a mini-trial on the reliability of various statements made by Yu after seeing photographs of defendant or defendant in person, a

mini-trial that the prosecution believed would require calling numerous witnesses and consume much time, all for little or no purpose. In particular, testimony would be needed to address the possible tainting of Yu's memory. To amplify on the allegations made in defendant's motion and as explicated in his opening brief on appeal, another prosecutor had made the mistake of showing Yu a suggestive photograph of defendant, in the form of or created from a jail booking photograph, that depicted defendant's likeness along with the word "WANTED" in a large Times New Roman font. Yu said he was 70 percent sure the man in the photograph was the hijacker. Then, the other prosecutor took Yu inside the courtroom where defendant was seated in handcuffs and asked if Yu recognized him as the assailant.

At a lengthy hearing on the motion, the defense argued that defendant's Sixth and Fourteenth Amendments confrontation rights would be violated if defense counsel could not ask Yu comprehensively if he had recognized defendant in various settings. The prosecution was worried that because of the taints caused by subsequent events and the passage of half a decade of time, Yu's "memory is suspect." Instead, the prosecution proposed to introduce Inspector Wong's testimony that Yu could not identify defendant in the photographic lineup and it did not object to Yu himself testifying that he could not identify defendant in court, although Yu was not asked that question before the jury.

The trial court tentatively agreed with the prosecution, commenting that "under [Evidence Code section] 352 as to undue consumption of time and mainly confusion of the issues," "I think today[,] five years later[,] an affirmative exclusion or an affirmative inclusion" of Yu's impression of defendant being his assailant would not "be helpful to the jury because of all of the intervening time and conduct relating to those other photo identifications." "To me the most relevant in terms of eyewitness identification is . . . that night closest in time when he . . . failed to select [defendant] out of the photo lineup. Later exclusions, inclusions, partial identifications are very confusing as well as not nearly as relevant . . . ."

5

Despite these initial misgivings, the trial court allowed Yu to testify during the hearing and outside the jury's presence so that the parties and it could ascertain the state of Yu's memory. Yu was able to remember that he could not identify defendant in the photographic lineup, but he thought he had seen 10 photographs, when there were six, and he also thought they had been presented to him both serially and together, which was not the case. Shown the six-picture lineup and asked, "Do those look like the photos that you were shown by the police that night . . . ?" Yu testified, "Some are the same, but some I don't recall because it has been so many years." In general, Yu struggled to remember his viewing of photographs at various times.

That testimony caused the trial court to reaffirm its tentative position. It ruled that Yu's memory was confused thanks to the passage of five years and "when you have been shown multiple lineups." Any such testimony "is at risk to make it unreliable," the court said; "that whole process relating to the photo identification is not a reliable statement." So it would exclude Yu's testimony on photographs under Evidence Code section 352 "because it is all going to come in . . . through the peace officers about the photo lineup . . . ."

This ruling was within the scope of the trial court's discretion. It violated neither state law nor defendant's constitutional rights.

"On appeal, 'an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence . . . .' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008.) A trial court abuses its discretion when its ruling falls outside the bounds of reason. (*People v. Benavides* (2005) 35 Cal.4th 69, 88.)

The Sixth Amendment's confrontation clause, as applied to the states via the Fourteenth Amendment, trumps Evidence Code section 352. (See *People v. Babbitt* (1988) 45 Cal.3d 660, 684 [making the same point regarding the statute vis-à-vis constitutional due process rights].) But that does not render state law a nullity. As defendant acknowledges with commendable candor, the federal constitutional standard

6

allows trial courts "wide latitude . . . to impose reasonable limits on . . . cross-examination based on concerns about . . . confusion of the issues . . . or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679.) Our Supreme Court expanded on this principle in *People v. Pearson* (2013) 56 Cal.4th 393: " '[R]eliance on Evidence Code section 352 to exclude evidence of marginal impeachment value that would entail the undue consumption of time generally does not contravene a defendant's constitutional rights to confrontation and cross-examination.' [Citation.] '[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." ' (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680, quoting [citation].) ' "[U]nless the defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' ([*Delaware v.*] *Van Arsdall*, *supra*, 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." [Citation.]' [Citation.]" (*Id*. at pp. 455-456.)

The trial court's ruling did not violate state law. The jury was going to know the key fact, namely that Yu could not identify his assailant from the photographic lineup. Whether that evidence came from Yu or Inspector Wong was little significant. The prosecution and the court wished to avoid a potentially complicated and costly mini-trial over what would have amounted to a quibble. "We may assume . . . that trial courts will exercise sound discretion under [Evidence Code] section 352 to preclude inefficient mini-trials of this nature." (*People v. Falsetta* (1999) 21 Cal.4th 903, 916.) Under section 352 "the court could reasonably conclude [the proffered evidence] was not probative enough to outweigh its potential for prejudice in terms of time consumption and issue confusion." (*People v. Vargas* (2001) 91 Cal.App.4th 506, 543.)

Defendant focuses on the trial court's comments about the unreliability of Yu's state of mind as of the time of the hearing. He notes that subdivision (b) of Evidence Code section 312 provides that "Subject to the control of the court, the jury is to determine the effect and value of the evidence addressed to it, including the credibility of witnesses . . ." and also notes the following admonition in *People v. Cudjo* (1993) 6 Cal.4th 585: "Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution; such doubts do not afford a ground for refusing to admit evidence . . . ." (*Id.* at p. 609.)

The trial court's concerns about Yu's credibility may not have been a proper basis to exclude evidence, but its other grounds for ruling, namely consumption of time and potential confusion over an insignificant matter, were within its discretion. Even if in part "our theory of admissibility differs from that of the trial court, 'we review the ruling, not the court's reasoning, and, if the ruling was correct on any ground, we affirm.' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.)

Defendant's Sixth Amendment claim likewise is unavailing. To repeat, the jury learned that Yu could not identify defendant in the photographic lineup, a failure of perception that was buttressed when the prosecution avoided asking Yu to identify him in court. He cannot " ' "show that the prohibited cross-examination would have produced 'a significantly different impression of [the witness's] credibility' [citation] [and so] the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." ' " (*People v. Pearson*, *supra*, 56 Cal.4th at pp. 455-456.)

Finally, we address defendant's due process claim. " '[F]undamental fairness [is] the touchstone of due process' [citation] and so a due process violation is usually established when the state proceeds in a manner that renders a trial fundamentally unfair.' " (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1422.) Allowing the jury to learn that Yu could not identify defendant, while not allowing the jury to be burdened

8

with an extended inquiry into the vicissitudes of various identification-related matters, did not render the trial fundamentally unfair.

## II. *Refusing to Let an Expert Witness Testify on the Meaning of Statements*

The trial court ruled that defendant was not entitled to present the testimony of an expert in perception and memory about the value of two possible interpretations of a statement Yu made in Cantonese. Defendant claims that the ruling denied him a constitutional due process right to present a defense. We find no merit in the claim.

There was a dispute over whether what Yu said in Cantonese as he examined the six-photograph lineup that included defendant was, as Inspector Wong heard him, that he could not identify defendant, or, as a certified court interpreter of Cantonese later assessed his statement, that he was unable to generate an " 'impression' " whether defendant was the assailant. The jury heard both versions and the prosecutor relied on the latter version in closing argument, arguing, in anticipation of a defense argument that Yu could not identify defendant, that not to have an impression of someone is not as exculpatory as a direct statement of nonidentification would have been.

Defendant had wanted to have an expert in perception and memory, University of Washington Psychology Professor Geoffrey Loftus, testify that a statement of a lack of impression is less significant than a statement of inability to identify, so that if Yu explicitly said he could not identify defendant that would cast additional doubt on defendant's identity as the perpetrator.

Dr. Loftus testified in limine. He spoke at length, addressing in scholarly detail topics ranging from the reliability of a simultaneous photographic lineup as opposed to a successive one, the ability of suggestive questions to influence memory, the possible influence of a question if it had been asked in English, although Inspector Wong asked Yu questions in Cantonese, and the difference between "an affirmative non-identification and a passive non-identification." Some of Dr. Loftus's testimony came in response to

9

hypothetical or evidence-based questions resting on what might have been said if the English rendition of the Cantonese was accurate.

The trial court ruled in part, "I'm going to preclude Dr. Loftus from testifying. I don't think it will be helpful. In fact, I think it will be more confusing." "So I'm going [to] preclude . . . Dr. Loftus from testifying under [Evidence Code section 352] grounds and foundation grounds."

The trial court did not abuse its discretion. Although it cited Evidence Code section 352, by referring to the not "helpful" nature of the proffered evidence it also, contrary to defendant's argument, invoked the rule that an expert witness's testimony must address topics outside common knowledge that jurors are expected to possess. The rule is codified in Evidence Code section 801: "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact . . . ."

When one moves beyond Dr. Loftus's addressing of certain scholarly views that would not have been relevant to this case and of hypothetical questions based on uncertain premises, the gravamen of his in limine testimony was this:

"[S]uppose the witness had got a good enough view of the perpetrator and formed a good enough memory to know the perpetrator had a skinny head and the witness now looks at the lineup and sees all six lineup members have roundish heads.

"That would be sufficient for the witness to rule out every lineup member because it would be including the suspect as not being the person they saw commit the crime. So that's an affirmative non-identification.

"A passive non-identification is one in which the witness enters the lineup situation with very little memory, not enough to make an adequate comparison between his memory of the actual perpetrator and the appearance of the six lineup members to make any decision one way or the other.

10

"So a passive non-identification gives considerably less information[;] it simply is a statement on the witness' part that they don't have enough information."

Such testimony would not have told the jury anything people do not already know as a matter of common knowledge: a person who sees an assailant and remembers the assailant's appearance could state affirmatively that no one in a lineup was the assailant; but a person who could not remember (or perceive) what the assailant looked like could only state that nothing in the photographs triggered a recollection. And an affirmative statement that the assailant was not in the lineup would be more probative than a statement that the victim could not "make any decision one way or the other."

Thus, the trial court's ruling was correct on Evidence Code section 801 grounds. Moreover, as regards Evidence Code section 352, although the proffered evidence would not have been notably prejudicial, it was so little probative that it bordered on the irrelevant. The prosecutor stated the obvious at closing argument: "Mr. Yu can't identify the defendant." This dispute amounts to a quibble over whether Yu simply could not recognize defendant or told Inspector Wong that defendant was definitely not in the photographic lineup. Either way, the point was that Yu did not name defendant as his assailant, whether because he failed to identify him or affirmatively excluded him. Even an affirmative exclusion would mean little, in light of Yu's testimony that defendant ordered him not to look at him and so he avoided doing so and, at best, caught a glimpse of him while under severe stress. For the trial court to exclude testimony about the linguistic nuances of these two possible versions of Yu's statement—to repeat, in his in limine testimony, Dr. Loftus described the issue as concerning the difference between "an affirmative non-identification and a passive non-identification"—lay within its discretion, because, as stated above, it has discretion to exclude time-consuming testimony of little help to the trier of fact. Defendant argues that Dr. Loftus's testimony would not have taken that much time, but that is optimistic speculation. His in limine testimony did and

11

it explored a number of subtleties that, if the jury heard them, could have been distracting in the view of a trial court reasonably exercising its discretion to exclude the evidence.

### III. Cumulative Error

Defendant claims that errors accumulated throughout the trial sufficient to require reversing the judgment. He is incorrect.

A claim of cumulative error is in essence a due process claim and is often presented as such (see, e.g., *People v. Rogers* (2006) 39 Cal.4th 826, 911). "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' " (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

We have found no error in claims I and II above; thus, there is no error to accumulate. In addition, there is no question that the trial was fair for purposes of the due process guaranty.

### IV. Prejudice

Finally, even if the court did err in the foregoing respects or in any other respect that defendant may perceive as appurtenant to the foregoing matters, any trial error in this case would have to be harmless, whether under the state law standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, or the federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24. As shown by the inculpatory evidence listed *ante*, page 3, the evidence against defendant was not just overwhelming, but conclusive and irrefutable.

**DISPOSITION**

The judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:

_____
ELIA, J.

_____
MÁRQUEZ, J.

13